THE STAVER CARRIAGE COMPANY

*v.*

THE PARK STEEL COMPANY.

*Opinion filed February 21, 1906—Rehearing denied April 5, 1906.*

CONTRACTS—*contract to furnish tire steel construed.* ·A contract to furnish a buggy company "all the tire steel of good and suitable quality which will be used in the buyer's works prior to September 1, 1899, not to exceed 14,000 sets nor to be less than 10,000," does not limit the buyer to the number of sets of tires in excess of 10,000 that it actually uses in its work prior to the date specified, but entitles it to the full 14,000 sets if that amount is necessary for use in its work prior to that date and to keep unimpaired its usual quantity of stock on hand.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. J. W. MACK, Judge, presiding..

BULKLEY, GRAY & MORE, for appellant.

MUSGRAVE, VROMAN & LEE, for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellee, the Park Steel Company, brought this suit in assumpsit in the circuit court of Cook county against appellant, the Staver Carriage Company, to recover $465.30 for tire steel sold and delivered in pursuance of a contract. Appellant pleaded a set-off of $2019 damages resulting from the failure and refusal of appellee to deliver all the tire steel which it was bound to deliver under the contract. The case was tried on the plea of set-off, and there was a verdict, followed by a judgment, for appellant for $1234.70. Appellee removed the case by appeal to the Appellate Court for the First District, and that court reversed the judgment of the

circuit court and entered judgment in favor of appellee and against appellant for $507.50, the amount sued for, with interest.

The contract was executed on August 4, 1898, between Park Brother & Co., a firm of which plaintiff is successor, and the Staver Carriage Company, and thereby plaintiff became bound to deliver to defendant "all the tire steel of good and suitable quality which will be used in buyer's works prior to September 1, 1899, not to exceed 14,000 sets nor to be less than 10,000 sets," at the prices and on the terms therein specified. The only plea being the plea of set-off, the demand of plaintiff was admitted and the controversy was over the set-off. The trial court found the controverted facts relating to the set-off in favor of the defendant, and the judgment of the Appellate Court does not contain any finding of facts, so that the facts were found the same by both courts. The cause was not remanded, and therefore the reversal was not on account of any erroneous rulings on the trial which could have been avoided or remedied upon another trial. The necessary conclusion is that the Appellate Court having found the facts the same as the trial court, held that such facts were insufficient, as a matter of law, to sustain the set-off. Counsel for both parties so understand the decision and judgment of the Appellate Court, and are agreed that our decision depends upon the construction to be given to that part of the contract above quoted. Within the limitations as to the number of sets fixed by the contract, it was a supply contract to meet the requirements of defendant's business, and in order to ascertain and give effect to the intention of the parties, the nature and necessities of the business and the surrounding circumstances are to be considered.

Plaintiff was a manufacturer of tire steel at Pittsburg, Pennsylvania. Defendant was a manufacturer of buggies and carriages at Auburn Park, Illinois, and used large quantities of tire steel in its factory. A set of tire steel consists of four pieces suitable for the four wheels of one buggy or

carriage. They are delivered in long, flat pieces tied in bundles, and when delivered, one set of defendant's men would sort them and put them in bins for the different sizes; another set of men would take the tires from the bins and punch them; a third set would bend the tires and weld them; they were then put on the wheels by another set who riveted them and bolted them, and the wheels then went to the paint shop. The pieces of tire steel varied in size from the proper length for a wheel thirty-six inches in diameter to one forty-seven inches in diameter, and from three-fourths of an inch in width to one and one-fourth inches, and they also varied in thickness, and the defendant, in the prosecution of its business, used one hundred and thirty-two different sizes. There is a great variety of wheels, and in filling orders it was necessary to keep on hand a great many sets, and defendant usually had from 2000 to 3000 sets in the bins. The daily capacity of the factory for putting tires on wheels ranged from 75 to 150 sets. The dispute as to the meaning of the contract is whether the plaintiff was bound to furnish enough tire steel, not exceeding 14,000 sets, as would keep up the requisite supply for defendant's factory to September 1, 1899, or was only bound to furnish such tire as would go into the construction of buggies or carriages before that time.

A month after the contract was made the first order and specification for tire steel was made, and the tire steel was shipped shortly afterward. Orders were given and shipments were made from time to time up to August 5, 1899, amounting in all to 10,600 sets. The shipments, at times, were slow, and defendant made complaint on that ground, saying that it had been compelled to buy a good many sets in Chicago, and the shipment which was made on August 5, 1899, was to fill an order given about two months before, on June 7. That order was for 1300 sets. On July 6, 1899, the defendant gave two orders for 1700 sets each, amounting in all to 3400 sets, and completing the contract number,

14,000 sets. Plaintiff refused to accept the order as made or to deliver that amount, stating that it had applied 496 sets of a previous order on the quota for July; that it would accept sufficient of the order to complete the quota for that month, viz., 581 sets, and would bill the remainder at market prices. There was no provision in the contract fixing any number or quota for any particular month, but plaintiff had claimed that orders should be apportioned. Tire steel had advanced in price after the contract was made, to the amount allowed defendant in the trial court. In the usual course of business it took from sixty days to six months to complete a buggy, and in August, 1899, when the dispute arose, defendant had in process of construction in its factory from 3000 to 5000 buggies. No part of the 3400 sets was delivered, and if that number of sets had been delivered, as ordered, there would have been in the bins on September 1, 1899, from 1500 to 2000 sets, while the defendant ordinarily kept on hand from 2000 to 3000 sets in the bins.

The trial court, in instructions to the jury, construed the contract as not requiring the plaintiff to deliver any more tire steel above 10,000 sets than the defendant would use in its works prior to September 1, 1899, and that in no event would it be required to deliver more than 14,000 sets, but if the jury believed, from the evidence, that the defendant ordinarily, in the reasonable prosecution of its business, carried a certain amount of tires in its bins for continuous use in its factory, the plaintiff would be required to deliver enough tire to enable the defendant to maintain that quantity in the bins. The evidence showed that the hypothesis of fact existed, and that if the 3400 sets had been delivered the amount of tire in the bins would be less than the amount ordinarily carried for the prosecution of the business and less than the amount on hand when the contract was made. The Appellate Court construed the contract as not requiring the plaintiff to deliver any tire or sets of tire which would remain in the bins on September 1 to keep up the stock, and

held that it was only bound to deliver so much of the 3400 sets as would have been used in the manufacture of buggies or carriages before September 1, 1899, and inasmuch as defendant specified a larger number, plaintiff was not bound to deliver any.

It appears to us that the trial court was right. Defendant's factory was running and consuming tire steel daily, and in conducting the business it was necessary to have on hand a large amount of tire steel to keep the factory running. Both parties knew that steel could not be furnished on the day of the contract, and that tire steel must be used from the stock on hand. By the contract the defendant was bound to take as much as 10,000 sets whether it could use them in the factory or not, and it was only entitled to 14,000 sets in any event, but between those limits it was the purpose of the contract to enable the defendant to provide a supply of tire steel for its factory and business. The construction given to the contract by the Appellate Court would require defendant to use up a part or all of the stock on hand at the beginning of the contract and not replace it, and to leave the bins empty when the contract expired. That construction seems to us too narrow and not according to the intention of the parties. The plaintiff was bound to furnish all the tire steel used in defendant's factory from the date of the contract until September 1, 1899, and defendant had a right to have the tire steel taken from its bins for use during that time replaced so as to keep the stock on hand unimpaired, otherwise the purpose of the contract to supply the needs and requirements for tire steel of defendant's factory and business during the period of the contract would not be fulfilled. The evidence showed, and the jury, under proper instructions as to the meaning and effect of the contract, found, that plaintiff did not furnish all the tire steel used or required for use in defendant's factory from the date of the contract to September 1, 1899, but neglected and refused to do so. The Appellate Court did not find the fact to be different,

but erroneously held that plaintiff was not bound to furnish that amount of tire, but only so much as would be used after the order for 3400 sets was given.

The judgment of the Appellate Court is reversed and the judgment of the circuit court is affirmed.

*Judgment reversed.*