BURGESS SULPHITE FIBRE COMPANY *vs.* PHILIP BROOMFIELD & another.

Suffolk.    November 19, 20, 1901. — January 3, 1902.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Contract*, Consideration, Construction.  *Frauds, Statute of.*

The plaintiff owned a large pulp mill and had on hand over three hundred and forty tons of scrap iron in its mill and mill yard which it wished removed, two thirds of it ready to be moved away and the remainder mixed with articles which the plaintiff could use and did not want to sell. The defendant, after sending an agent to the plaintiff's mill to look at the iron, made the following offer in writing : " We hereby agree to pay you $12 per ton of 2,000 lbs., spot cash, f. o. b. Berlin, for all your iron which you may desire to sell, both cast and wrought, also all cables. This offer covers everything in the line of iron, whether located in your mill or on your premises, except galvanized iron, and is to be taken where found, we to assume all costs of removing the same, you to have privilege of indicating what you desire to have us take and of reserving what you wish. We furthermore agree to remove promptly all the iron which you wish us to take after acceptance of the proposition by you, and guarantee not to do any damage whatever nor to interfere with your operations or work in any way." An acceptance was written on the same paper by the plaintiff's superintendent. The plaintiff then requested the defendant to take away the iron, which he refused to do. The plaintiff had it taken away by another at a loss, and sued for the difference in price. *Held*, that there was a binding contract, by which the plaintiff was bound to sell to the defendant at $12 a ton whatever iron then on the premises was sold to any one, and the defendant was bound to remove promptly on request such iron as the plaintiff selected for sale and to pay $12 a ton for it. *Held, also*, that the iron which the defendant agreed to buy was described sufficiently to satisfy the statute of frauds. *Held, also*, that the clause that the defendant should pay $12 per ton "spot cash, f. o. b. Berlin" must be construed with the subsequent clause " we to assume all costs of removing the same," and that construed together the two clauses meant that the defendant was to put the iron on the cars and bear the expense of doing so but no other expense.

CONTRACT for the defendants' refusal to accept certain scrap iron alleged to have been sold to them by the plaintiff. Writ dated July 2, 1900.

In the Superior Court, *Bond*, J. ruled, that there was no evidence to warrant a verdict for the plaintiff and directed a verdict for the defendants; and the plaintiff alleged exceptions.

*C. K. Cobb*, for the plaintiff.

*P. J. Doherty*, (*A. E. Burr* with him,) for the defendants.

LORING, J. On April 26, 1900, the plaintiff and defendants entered into the following contract: " Berlin, N. H. U. S. A. April 26, 1900. Burgess Sulphite Fibre Co., Berlin, N. H. Gentlemen : We hereby agree to pay you twelve dollars ($12.00) per ton of 2,000 lbs. spot cash, f. o. b. Berlin, for all your iron which you may desire to sell, both cast and wrought, also all cables. This offer covers everything in the line of iron, whether located in your mill or on your premises, except galvanized iron, and is to be taken where found, we to assume all costs of removing the same, you to have privilege of indicating what you desire to have us take and of reserving what you wish. We furthermore agree to remove promptly all the iron which you wish us to take after acceptance of the proposition by you, and guarantee not to do any damage whatever nor to interfere with your operations or work in any way. P. Broomfield & Co. Per C. Broomfield. Accepted. Burgess Sulphite Fibre Co. By G. E. Burgess, Supt."

The defendants' first contention is that this was not a contract, but an offer or option which never became binding. The plaintiff and defendants have discussed at length a great many cases in other jurisdictions which are in conflict ; but there is no real conflict in these cases in regard to the principle involved.

The principle on which these cases travel is, that when the only consideration is one by way of mutual promises, if the plaintiff is under no obligation in the matter, there is no consideration for the promise of the defendant and his promise is *nudum pactum.*

This principle was applied in this Commonwealth in *Thayer* v. *Burchard*, 99 Mass. 508. In that case, the defendants, who were operating a railroad as trustees for bondholders, wrote to

the plaintiffs, who were grain merchants buying flour and grain in the West, that they would transfer flour and grain for them at $4 a ton, " this rate to continue in force until close of navigation, unless notice to the contrary." In answer, the plaintiffs wrote: " We accept the proposition." This was held to be an offer on the part of the defendants and not a contract, because the plaintiffs did not come under any obligation to the defendants to furnish any flour or grain for transportation and were at liberty to buy grain or not, as they pleased, and if bought to ship it by the defendants' railroad or any other line.

But that principle does not apply to the case at bar. The circumstances under which the contract in question was made are stated in the testimony of the superintendent of the plaintiff corporation. From that it appears that the plaintiff corporation owns a large mill for manufacturing sulphite fibre to be used in making paper, and at the date of the contract had something over three hundred and forty tons of scrap iron which it wished removed from its premises, part of it being in the mill and part in the mill yard. Two thirds had been " culled," and was ready to be moved away; the other third was lying in heaps, " mixed up " with pulleys, shaftings and bearings which the plaintiff could use in the mill and did not want to sell; and, in addition, " mixed up " in the heaps, were some brass and lead not included in the contract; also some valves, some good and some not; those which were good it wished to keep and those not good it wished to sell. On the day in question, an agent of the defendants appeared with a letter of introduction in which they stated that their firm " are the people who bought the scrap material " of another sulphite mill, " and if you have any scrap material to sell," they would be glad if the plaintiff would let their agent " look over the stock, and he will quote you our best price." The superintendent testified that he went with the agent of the defendants and looked at the material it had for sale, and immediately afterwards the written agreement was entered into. The defendants' agent in question testified that he saw a clerk of the plaintiff corporation, not the superintendent, and that he did not look at the heaps of iron at all.

The plaintiff, immediately after the contract was signed,

asked the defendants to take away the iron; after putting off the day for beginning work because the market had fallen and the defendants' mills would not take the iron, the defendants refused to do anything in the matter. The plaintiff then had the iron taken away by another dealer in scrap iron, at a loss, and brought this action for the difference.

We are of opinion, not only that the presiding judge was wrong in directing a verdict for the defendants, but that he should have told the jury that the contract was valid; and, as there was no dispute as to its having been broken by the defendants, the only question for them to pass upon was the amount of damage sustained by the plaintiff. For the purposes of this discussion we assume, therefore, that the defendants' testimony was true. Construing the contract in the light of the circumstances testified to by the plaintiff and not contradicted by the defendants, the obligation of the plaintiff under the contract is to sell to the defendants, at $12 per ton, whatever iron then on the premises was afterwards sold to any one, and the obligation of the defendants was to remove promptly such iron as the plaintiff selected when requested so to do by the plaintiff, and pay $12 per ton therefor. The contract is not lacking in mutuality because the amount of iron to be removed is not defined. It is enough that the plaintiff came under some obligation to the defendants; if he did, there is a consideration for their promise; the extent of the plaintiff's obligation is not material; it would have been possible to have "culled" all the iron and made an agreement specifying definitely the iron to be taken away and sold, but to do so would have been an expense to the plaintiff, and would have required him to ask more of the defendants. The parties were content to agree upon terms less extensive and less expensive, namely, that the defendants should take whatever iron was sold out of the factory, whenever requested to do so, the iron being selected by the plaintiff when picked over by the defendants in taking it away; for such a contract, they undoubtedly paid less per ton than if the iron had been "culled" by the plaintiff and was stacked by it ready for removal. The less extensive contract is just as much founded on a valid consideration as the more extensive contract would have been. As was said in argument, it is like a contract for the purchase and

sale of all the output of a mill for a season ; such a contract is a valid one, although the amount bought and sold is not ascertained ; *Hickey* v. *O'Brien,* 123 Mich. 611 ; *Minnesota Lumber Co.* v. *Whitebreast Coal Co.* 160 Ill. 85 ; *National Furnace Co.* v. *Keystone Manuf. Co.* 110 Ill. 427 ; Marshall and Bardeen, JJ. dissenting in *Hoffman* v. *Maffioli,* 104 Wis. 630, 638, 646 ; *Smith* v. *Morse,* 20 La. An. 220 ; although there is no obligation to operate the mill, *Burton* v. *Great Northern Railway,* 9 Exch. 507 ; see *Wells* v. *Alexandre,* 130 N. Y. 642, where it was held that a similar contract for the purchase of all coal needed by the defendant's steamers for a year should be construed to require the steamers to be kept in commission by him.

There is nothing in the defendants' contention that the iron sold is not sufficiently described in the written contract to satisfy the statute of frauds. The contract is explicit as to the iron covered by it ; it states that it " covers everything in the line of iron, whether located in your mill or on your premises, except galvanized iron, . . . you to have the privilege of indicating what you desire to have us take and of reserving what you wish." The iron to be paid for is that in fact taken away under this agreement.

The defendants' last contention is that by the terms of the contract the iron which was to be taken and paid for by the defendants under the contract was to be put on board the cars by the plaintiff at Berlin, and this was not done by it. They rely in this connection on the clause that the defendants were to pay " $12 per ton of 2000 lbs., spot cash, f. o. b. Berlin." This clause must be construed with the subsequent clause, " we to assume all costs of removing the same." We are of opinion that, construing the two clauses together, the contract is that the defendants were to put the goods on the cars and bear the expense thereof, but were not to be at any other expense in the matter.

*Exceptions sustained.*