## IMPERIAL REFINING CO. v. KANOTEX REFINING CO.

Circuit Court of Appeals, Eighth Circuit.
September 24, 1928.

No. 8017.

194

C. H. Rosenstein, of Tulsa, Okl. (M. H. Silverman, of Tulsa, Okl., on the brief), for plaintiff in error.

John J. Jones, of Chanute, Kan. (E. K. Childers, of Arkansas City, Kan., on the brief), for defendant in error.

Before BOOTH, Circuit Judge, and DEWEY, District Judge.

BOOTH, Circuit Judge. This is a writ of error to a judgment dismissing a cause, after an order had been entered sustaining a demurrer to the complaint, and after plaintiff had declined to plead further. The questions raised by the demurrer were: (1) Whether the complaint stated facts sufficient to constitute a cause of action; and (2) whether the complaint showed on its face that the alleged cause of action was barred by the statute of limitations of the state of Kansas. Jurisdiction was based on diversity of citizenship and the requisite amount involved.

The complaint alleged in substance as follows: That the plaintiff, Imperial Refining Company, a corporation, had on May 28, 1919, made a written contract with Fern Oil Company, a joint-stock association, whereby plaintiff agreed to purchase from Fern Oil Company and that company agreed to sell to plaintiff for a period of one year commencing June 4, 1919, all of the seven-eighths of the oil produced and saved from a certain oil and gas lease owned by the Fern Oil Company; that on the same day plaintiff assigned the contract and all its rights thereunder to the defendant herein, the Kanotex Refining Company, by written instrument duly signed by plaintiff, and duly accepted in writing by the Kanotex Company; that at the time when the contract and the assignment were made the Fern Oil Company was operating and developing the leased premises for oil and gas, and did thereafter obtain oil in paying quantities on the premises; that, after the assignment was made, defendant, acting under it and under the rights conferred by the contract, caused pipe line connections to be made to the leased premises, and made all necessary preparations to run and take the oil which was being produced at the time from the premises; that defendant, after making the pipe line connections, refused to run the oil then being produced; that as a result of the actions of defendant in making the pipe line connections, and then refusing to run the oil, the Fern Oil Company and its assignees sustained damages; that thereafter the Fern Oil Company and its assignees commenced suit in the state court of Oklahoma against plaintiff as the original promisor to recover damages for breach of the contract; that plaintiff herein immediately notified defendant herein of the suit brought by the Fern Oil Company and requested defendant to defend the same; that, though defendant did not employ counsel to defend the suit, yet it did advise with plaintiff relative thereto, and furnished certain of its employés as witnesses at the trial, and its counsel was present at the trial; that plaintiff herein defended the suit with diligence, but nevertheless judgment was obtained against it in the amount of $18,000; that plaintiff promptly notified defendant herein of the judgment and preserved the right to appeal, and notified defendant that it did not desire to appeal, but that, if defendant desired to appeal, plaintiff would cooperate, and that plaintiff expected defendant to protect it against the judgment obtained; that defendant disregarded the notice sent by plaintiff, and took no steps to perfect an appeal; that plaintiff has paid and satisfied the judgment, and has paid the attorney's fees and costs incident to the suit; that by reason of the fact that defendant was the assignee of the contract with the Fern Oil Company, and succeeded to plaintiff's rights and obligations under the same, and by reason of the acts of defendant heretofore recited, plaintiff is entitled to recover from defendant the amount of the judgment, attorney's fees, and costs paid by plaintiff as before stated. Attached to the complaint as exhibits were copies of the contract with the Fern Oil Company, of the assignment to the defendant and of the journal entry of the judgment obtained against plaintiff in the state court.

One of the points raised by the demurrer to the complaint was that the contract with the Fern Oil Company was invalid, because of indefiniteness of description of the leased premises. The description in the contract was "all of the holdings of the Fern Oil Company in block 84"—no town, county, or state being given. However, the complaint itself, against which the demurrer was aimed, contains a full and complete description of the premises as follows: " * * * The north two and one-half acres of the east ten acres

of the south 37.9 acres of the east 97.9 acres of block 84, Red River Valley subdivision, in Wichita county, Texas." We think that this complete and definite description in the complaint should not be discarded for the indefinite description contained in the contract, in view of the fact that there is no inconsistency between the two descriptions, and especially in view of the facts alleged in the complaint, showing that both the Fern Oil Company and the Kanotex Company had identified the premises and had done work thereon pursuant to the contract. We think there is no merit in this point of the demurrer.

■ The next point of the demurrer is that the contract with the Fern Oil Company was void for lack of mutuality, and that, since the contract was void, no obligation in reference to it were assumed by the Kanotex Company. It may be conceded that, unless the contract between the Imperial Company and the Fern Company was valid, no duty in reference thereto rested on the Kanotex Company under the assignment. Two questions therefore arise: (1) Was the contract with the Fern Company invalid for lack of mutuality? (2) Was the Kanotex Company under any obligation to the Imperial Company to carry out the contract?

As to the first question, it is claimed that by the terms of the contract the Fern Company was not bound to sell any oil to the Imperial Company; that in this respect the contract was subject wholly to the wish or whim of the Fern Company. The language of the contract is as follows:

"* * * The Seller [the Fern Company] hereby offers and agrees to sell and deliver to the 'Company' [the Imperial Company] his, or their seven-eighths (7/8ths) part of all oil produced and saved from wells No. 1, and up on the following described property, * * * for the period beginning 7 a. m. June 4th, 1919, and ending 7 a. m. June 4th, 1920. And the Company hereby agrees to accept and purchase said oil subject to the following conditions:

    *        *        *        *        *

"7. The Seller and Company further agree that this contract shall be in force and effect for the full term hereof and be binding on their successors, assigns, heirs or administrators."

We construe this language to mean that, if any oil was produced on the land in question and during the period named, the Fern Oil Company was bound to sell and deliver it to the Imperial Company. While no exact number of gallons is specified, yet all of the output belonging to the Fern Company during the named period is covered, and the Fern Company disqualifies itself to sell to any one else than the Imperial Company or its assigns. The books are full of cases involving questions relating to the mutuality of contracts. Out of the multitude we have selected but a few, which we think will serve to illustrate the principles which must control the case at bar.

Transcontinental Petroleum Co. v. Interocean Oil Co., 262 F. 278 (C. C. A. 8), was a suit by the seller for breach of contract. Plaintiff had agreed to sell 1,200,000 barrels of petroleum oil, "provided, however, that deliveries in said quantity or in any quantity are limited to the actual production of the oil wells owned by the vendor and the production of other wells which may be from time to time controlled by the vendor." The court in its opinion said:

"The argument of defendant is that the proviso of the first paragraph, limiting plaintiff's undertaking to the production of wells owned or controlled by it, made it entirely optional with plaintiff to deliver any oil at all. There is no merit in the argument. In effect, the contract bound the plaintiff to deliver the entire output of its wells, up to the quantities specified. No such personal choice or option was given to withhold or refuse deliveries of oil produced by its wells, as is sometimes held to destroy the requisite mutuality of contract obligations. The limitation is a physical one, of a kind common in business affairs. When the quantity of a commodity to be delivered or received under a contract of sale rests in the uncontrolled will or desire of one of the parties, mutuality is lacking. It is otherwise when the quantity is measured by the output or requirements of an established plant or business during a limited time. Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 52 C. C. A. 25, 114 F. 77, 57 L. R. A. 696. This latter rule is an adjustment of legal principles to necessary and reasonable business usages. It appears plaintiff owned and controlled about 20 oil wells in the Panuco field, with extensive structural equipment, and though the life of any particular well might not be forecast with certainty, it is idle to say plaintiff did not have an established plant, the actual product of which it could bind itself to sell and deliver in whole or in part during the time limited. The plaintiff could not, without violating its contract, have capped its wells or choked their production to escape deliveries. In that respect a correlative duty on its part would be implied."

Robertson v. Miller, 286 F. 503, was a case involving breach of contract by the purchaser of ore. In its opinion the Circuit Court of Appeals of the Second Circuit said:

"By the contract, the Mammoth Company promised to sell, and Beer, Sondheimer & Co. promised to buy at a fixed price, the total production over a definite period of a specified mine owned and operated by the Mammoth Company. For these mutual promises there is ample consideration. * * * Where the certainty can be ascertained from the means to be supplied by the future exercise of the business in good faith and in the normal manner of such business, such a commercial transaction does not lack mutuality. Marx v. Amer. Malting Co., 169 F. 582, 95 C. C. A. 80. This principle has been applied to contracts that provide for the purchase and sale of the total amounts of given articles needed or required in an established enterprise over a definite period. Texas Co. v. Pensacola Corp. (C. C. A.) 279 F. 19; Pittsburgh Plate Glass Co. v. Neuer Glass Co., 253 F. 161, 165 C. C. A. 61. An obligation to produce and ship ore in good faith is clearly implied within the terms of this contract. No personal choice or option is given to withhold or refuse deliveries. When the quantity is measured by the output, the Mammoth Company could not, without violating its contract, have escaped producing and delivering the ore."

In affirming the decree in the above case, the Supreme Court in its opinion said (266 U. S. 243, 252, 45 S. Ct. 73, 76, 69 L. Ed. 265):

"The parties intended to make a contract —one to sell, and the other to buy, zinc ore. By plain statements and manifest implications, the seller was bound for a definite time not otherwise to dispose of its ore; the buyers were given an option on the lower grade ore; the seller was bound at all times, when not prevented or delayed by some cause beyond its control, to mine and to ship to the buyers the total production of zinc ore of the specified grade; and the buyers were bound to take and pay for all such ore when not prevented or delayed by causes beyond their control as specified in the contract. The quantities of ore to be mined and shipped were not limited to those to be produced by the equipment and methods employed at the time of the execution of the contract. The proposed picking plant was to be added, and increased output was expected and bargained for. * * * The writing did not give the seller the option to ship or to refrain from shipping as it saw fit, or leave the quantity to be delivered to its choice. There was no want of consideration or lack of mutuality."

For a thorough analysis of the contract involved in the foregoing case, see Robertson v. Garvan (D. C.) 270 F. 643.

Ramey Lumber Co. v. John Schroeder Lumber Co. (C. C. A.) 237 F. 39, was a suit by the seller of lumber for breach of contract. The provisions of the contract, so far as here material, were:

" * * * In consideration of the covenants and promises made herein by the party of the second part the said first party hereby agrees to sell to said second party all the western pine shop lumber said first party will manufacture or own during the season of 1911, consisting of 5/4, 6/4, and 8/4 stock at the following prices loaded on cars in the rough: * * * Said second party agrees to purchase and receive the above-named lumber as it is loaded by said first party and to pay therefor the above-named prices in the following manner."

The trial court held the contract void for want of mutuality. In reversing the judgment, the Circuit Court of Appeals of the Seventh Circuit said:

"As to the defenses of uncertainty and want of mutuality, we are unable to concur in the decision of the trial court. The contract did not lack mutuality of obligation. While defendant promised to buy of plaintiff all the lumber of a certain quality that plaintiff might own during the season, plaintiff bound itself, if it did manufacture or acquire any such lumber, to sell all of it to defendant and to no one else. Thus plaintiff deprived itself of the right to sell lumber to whom it pleased. The promise to restrict its freedom by giving up its right to sell to others was real and definite. It was the substantial and contemplated consideration for defendant's promise to buy all that plaintiff might own during the season. There was the mutuality of obligation essential to a bilateral contract; there was the consideration essential to the validity of any contract. Conley Camera Co. v. Multiscope & Film Co., 216 F. 892, 133 C. C. A. 96; Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367. That the plaintiff did not bind itself to acquire or manufacture any such lumber is immaterial. Its promise to deal with defendant was the valid consideration for the obligation by defendant—a consideration that made the undertaking of the other party binding and enforceable."

In Texas Co. v. Pensacola Maritime Corp. (C. C. A.) 279 F. 19, the Pensacola Com-

pany sued for breach of contract to deliver certain oil which it claimed to have bought. By the contract the Texas Company agreed to sell to the Pensacola Company "all of the bunker oil sold by the purchaser [plaintiff] to vessels in the port of Pensacola, Florida, from August 1, 1919, to September 30, 1920." The contract also contained the following: "By this memorandum the seller sells and agrees to deliver and the purchaser purchases and agrees to pay for the goods mentioned within." Plaintiff had a verdict. One of the points raised in the case was: "That the contract was void for want of consideration, plaintiff not having, at the time it was made or before said time, ever engaged in the business of selling bunker oil, and not binding itself to take any particular quantity of oil." In reference to this point the Circuit Court of Appeals for the Fifth Circuit said:

"We do not think the original contract as made was invalid for want of mutuality. The only basis of this contention is that the purchaser had no established business in the sale of bunker oil at Pensacola, and it is insisted that therefore its undertaking to take all of the oil it might be able to sell to ships at Pensacola during a fixed period was too indefinite an undertaking to afford a consideration for defendant's promise to sell to it all oil it might so need. It seems to us that the objection does not arise on the validity of the contract, but would relate alone to the possible ability to prove specific damages in case of a breach. The contract was an undertaking on the purchaser's part to buy all of its requirements at Pensacola from the defendant. It clearly agreed not to buy for such requirements during the terms of said contract, except from the defendant. The defendant agreed to sell to plaintiff all such requirements up to certain fixed quantities. Here was the consideration of a promise both to do and to refrain from doing a certain thing as a consideration for the promise to sell certain goods at fixed prices. It was not a mere undertaking to buy what plaintiff might desire, but an undertaking to take all of its needs from defendant alone, within the quantities stated."

In Green v. Lovejoy, 155 Minn. 241, 193 N. W. 173, a Minnesota case, plaintiff made a contract to sell to the defendant all the lumber which the plaintiff might manufacture in a specified year, not exceeding a named quantity. It was claimed that the contract was invalid because the plaintiff did not agree to manufacture any lumber whatever. The court, however, said:

"Plaintiff agreed to sell to defendant all the white pine lumber that he manufactured in 1919. He so bound himself that he lost the right to sell to any one else. He 'tied his hands' so that he could deal with no other. While he did not bind himself to manufacture, yet he did bind himself to sell to defendant at the stipulated price all the lumber that he did manufacture in that year. That such an obligation is a sufficient consideration to sustain an option has been determined by this court in two carefully considered cases decided since this appeal was taken. City of Marshall v. Kalman, [153 Minn. 320,] 190 N. W. 597; Trainor v. Buchanan Coal Co., [154 Minn. 204,] 191 N. W. 431."

In Golden Cycle Mining Co. v. Rapson Coal Mining Co., 188 F. 179 (C. C. A. 8), the contract provided that the vendor "agrees to purchase from the coal companies all the lignite coal it may use in the operation of its said mines and reduction works," and further provided that the vendees "agree to supply to the mining company all of said coal that it may desire to purchase and use for the purposes aforesaid." In answer to the contention that the contract was void for want of mutuality, the court said:

"We think the word 'use' in the language of the contract is equivalent to the words 'needed,' 'required,' or 'consumed,' and brings the agreement of the parties within the rule enunciated by this court in the case of Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 52 C. C. A. 25, 114 F. 81, 57 L. R. A. 696. * * * We therefore are of the opinion that the agreement above set forth constituted a valid contract on the part of the mining company to purchase and on the part of the coal companies to supply all the lignite coal needed or required by the mining company in the operation of its mines and reduction works during the time specified in the contract."

See, also, T. W. Jenkins & Co. v. Anaheim Sugar Co. (C. C. A.) 247 F. 958, L. R. A. 1918E, 293; Pittsburgh Plate Glass Co. v. V. H. Neuer Glass Co. (C. C. A.) 253 F. 161; Kenan, McKay & Spier v. Yorkville Cotton Oil Co. (C. C. A.) 260 F. 28; Select Pictures Corp. v. Australasian Films (D. C.) 260 F. 296; Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 796, 812; Hogue-Kellogg Co. v. Baker, 47 Cal. App. 247, 190 P. 493; McIntyre Lumber & Export Co. v. Jackson Lumber Co., 165 Ala. 268, 51 So. 767, 138 Am. St. Rep. 66; Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367; notes, 1 A. L. R. 1392, 9 A. L. R. 276, 23 A. L. R. 574, and 24 A. L. R. 1352.

Those of the foregoing cases which we

have reviewed must be carefully distinguished from the equally numerous class of cases involving agreements, sometimes known as the "will, wish, or want contracts." Such an agreement was involved in Cold Blast, etc., Co. v. Kansas City Bolt, etc., Co., 114 F. 77, 57 L. R. A. 696 (C. C. A. 8), where the offer on one side was "nothing but a price list," and the acceptance contained no agreement to buy any of the articles mentioned. The contract was held void.

In the case of A. Santaella & Co. v. Otto F. Lange Co., 155 F. 719 (C. C. A. 8), there was an offer by the vendor to sell to the vendee a certain brand of cigars "as many as the vendee desired for his wants" as long as the vendee desired to sell them. The court found that there was no promise or implication that the vendee would at any time buy any of the cigars and that the alleged contract was void for want of mutuality.

In Midland Steel Sales Co. v. Waterloo, etc., Co., 9 F.(2d) 250 (C. C. A. 8), the alleged agreement consisted of an offer to buy the "surplus stock of cold rolled steel," etc., of the alleged vendor. There was no showing that the parties ever agreed on what the "surplus" stock was, or that the vendor promised to sell any quantity of steel to the vendee. The contract was held void for lack of mutuality.

The following cases, relied upon by defendant in error, are of similar character: Mowbray Pearson Co. v. E. H. Stanton Co., 109 Wash. 601, 187 P. 370, 190 P. 330; Higbie v. Rust, 211 Ill. 333, 71 N. E. 1010, 103 Am. St. Rep. 204; Wickham & Burton Coal Co. v. Farmers' Lumber Co., 189 Iowa, 1183, 179 N. W. 417, 14 A. L. R. 1293, and note; Rehm-Zeiher Co. v. F. G. Walker Co., 156 Ky. 6, 160 S. W. 777, 49 L. R. A. (N. S.) 694.

The two classes of cases are respectively well illustrated by the two cases of Ehrenworth v. Stuhmer & Co., 229 N. Y. 210, 128 N. E. 108, and Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N. Y. 459, 132 N. E. 148, 24 A. L. R. 1348. In the former the vendor promised to sell and the vendee promised to buy all the bread of a particular kind that vendee required on his specified route. The price was fixed, and the duration of the contract was fixed. The court in its opinion said: "It is contended that there was no express promise to purchase any particular amount of the black bread, but this promise, even if it be not expressed, is implied. The plaintiff impliedly, if not expressly, agrees to buy all the black bread which he can use on his route, and to purchase it from no other." The contract was upheld.

In the latter case the contract was contained in a letter, which, so far as here material, read as follows:

"Gentlemen: We are instructed by our Mr. Von Schuckmann to enter your contract for your requirements of 'special BB' glue for the year 1916, price to be 9¢ per lb., terms 2 per cent 20th to 30th of month following purchase. Deliveries to be made to you as per your orders during the year, and quality same as heretofore. Glue to be packed in 500-lb. or 350-lb. barrels and 100-lb. kegs, and your special label to be carefully pasted on top, bottom, and side of each barrel or keg. * * * Peter Cooper's Glue Factory, W. D. Donaldson, Sales Manager."

At the bottom of the letter the president of the plaintiff vendee wrote, "Accepted, Oscar Schlegel Manufacturing Company," and returned it to the defendant. The plaintiff was not engaged in any business requiring the use of glue. It was simply a jobber, selling, among other things, glue. The court, in holding the contract invalid, said: "The plaintiff, it will be observed, did not agree to do or refrain from doing anything. It was not obligated to sell a pound of defendant's glue or to make any effort in that direction. It did not agree not to sell other glue in competition with defendant's."

Distinguishing the Ehrenworth Case, the court said: " * * * It was agreed that plaintiff should purchase and defendant sell all the bread of the kind specified which plaintiff required in a certain locality and pay therefor a price specified in the agreement. The plaintiff also agreed he would not sell any other bread of that kind on that route during the life of the contract, which was to continue so long as the parties remained in business. This contract, it will be noticed, specified the articles to be sold, the price to be paid, the quantity to be furnished, and the term of the contract, during which time plaintiff agreed not to sell any other bread of the kind named in that territory."

In the case at bar, while the complaint does not allege that the Fern Company had producing wells on the premises described at the time of making the contract, yet the complaint does allege that the Fern Company owned the oil lease on the premises and was operating and developing the same to produce oil, and thereafter did produce oil in paying quantities. By the contract the Fern Company promised to sell and the Imperial Company promised to buy the oil produced.

The price was fixed; the duration of the contract was fixed; the amount of oil was fixed by the output. We are clearly of the opinion that the case at bar comes within the first class of cases above reviewed, and that the contract involved did not lack mutuality and was valid.

■ It is faintly suggested by defendant in error that the contract with the Fern Company was void for the further reason that the Imperial Company was not bound by the contract to buy any oil whatever. This contention is based upon the first sentence of the second condition under which the Imperial Company purchased, reading as follows: "The maximum amount that said Company is to be compelled to receive and pay for is ——— property." By previous language in the contract, as we have already seen, the Imperial Company bound itself to purchase all of the output belonging to the Fern Company during the period named. This later clause of the contract as to the maximum, if it had been filled out, would have limited the first provision; but, the parties having seen fit not to fill it out, the result was not to render the whole contract void, but simply to eliminate any question of a maximum, and to leave the Imperial Company bound to purchase without maximum the whole of the output belonging to the Fern Company during the period named.

■ The next question is: Was the defendant Kanotex Company under any obligation to the Imperial Company to carry out the provisions of the Fern Oil Company contract, by reason of the assignment of that contract to defendant by the Imperial Company? It is a general rule that the right of one party to a contract to its performance by the other may be assigned, absent any provision to the contrary in the contract or by statute, and excepting contracts involving relations of personal confidence or calling for personal services. 5 C. J. pp. 874–882, §§ 44–47. The contract in the case at bar did not forbid an assignment, and no statute is pointed out having such effect; nor did the contract fall within the excepted classes. That it was the intention of the parties to the assignment that the original contract should be carried out is apparent from the terms of the assignment. It provides:

"It is understood and agreed that a part of this consideration is that the said Kan-O-Tex Refining Co. will mail its check to the said Imperial Refining Co., at its office in Fort Worth, Texas, on the 1st of each month for an amount equal to 10 cts. per barrel for each and every barrel of crude oil taken from the lease belonging to the Fern Oil Co. in block 84. The said Kan-O-Tex Co. agrees to connect their pipe lines to two five hundred barrel steel tanks and one sixteen hundred barrel wood tank, said tanks being on the lease of the Fern Oil, by Tuesday night, June 3d, 1919. This transfer and assignment is made subject to the contract made and entered into the 28th day of May, 1919, by and between Imperial Refining Co. and the Fern Oil Co."

By this assignment from the Imperial Company to the Kanotex Company, the latter company acquired the right of the Imperial Company in the contract. This is conceded. But this was not the only effect of the assignment. The Imperial Company by the assignment not only transferred its rights in the contract, but it also delegated its duties, and the Kanotex Company by accepting the assignment accepted the delegation of the duties. It accepted the burdens with the benefits. As between the Imperial Company and the Kanotex Company, a primary duty rested upon the latter company to perform the contract, and the Imperial Company stood toward the Kanotex Company in the nature of a surety for the performance of the contract. We think the weight of authority sustains these views.

In 5 C. J. 976, it is said: "As between the assignee and the assignor, the assignee is bound to carry out the provisions of the assigned contract and in all respects to comply with the terms of the assignment, and the assignor may recover from him the damages he sustained by reason of the failure of the assignee to comply with the contract."

In Cutting Packing Co. v. Packers' Exchange, 86 Cal. 574, 25 P. 52, 10 L. R. A. 369, 21 Am. St. Rep. 63, the Cutting Company had contracted with one Blackwood to purchase from him certain apricots. The Cutting Company assigned its interest in the contract to Packers' Exchange. Blackwood refused to accept the Packers' Exchange in place of the Cutting Company, but delivered the apricots to the Cutting Company, according to the contract. The Cutting Company received the apricots and paid for them, and tendered them to the Packers' Exchange; but the latter refused to accept them. Thereupon the Cutting Company sold them to the best advantage, but sustained a loss, for which it sued Packers' Exchange. It was held that the original contract was assignable; that the assignment did not relieve the Cutting Company from its obligation to Blackwood; that the refusal of Blackwood did not relieve Packers' Ex-

change from its obligation to the Cutting Company under the assignment. The court in its opinion said:

"So far as the parties to this suit are concerned, the appellant [Packers' Exchange] contracted with the respondent [the Cutting Company] to accept and pay for the fruit Blackwood had contracted to deliver to the latter. It could make no difference, therefore, whether the fruit was delivered to the appellant by Blackwood directly or by the respondent. As between the parties to this suit, the appellant was bound to receive and accept the fruit, and it cannot relieve itself from this obligation by showing that Blackwood had refused to relieve the respondent from its obligation to him. * * * We therefore think it plain that as the plaintiff, as assignor, was still bound to Blackwood to pay the price stipulated in the contract, notwithstanding the assignment, and as the defendant, as assignee, assumed such obligation, the plaintiff, as between it and the defendant, stood in the nature of a surety for the latter for the performance of the obligation. If this be correct, it then follows that from the assignment an implied contract arose between the plaintiff and defendant, whereby the latter became bound to the former to receive and pay for the apricots, according to the terms of the original contract."

See, also, Atlantic & N. C. R. Co. v. Atlantic & N. C. Co., 147 N. C. 368, 61 S. E. 185, 23 L. R. A. (N. S.) 223, 125 Am. St. Rep. 550, 15 Ann. Cas. 363; Corvallis & Alsea River R. Co. v. Portland E. & E. Ry. Co., 84 Or. 524, 163 P. 1173. The latter case is very similar in its facts to the case at bar.

From the foregoing discussion, we think it is plain that there was a duty under the Fern Oil Company contract on the part of the Imperial Company toward the Fern Company to carry out the terms of that contract, and that it is equally plain that there was also a duty, under the assignment of that contract, on the part of the Kanotex Company toward the Imperial Company to carry out the terms of the same contract. The allegations of the complaint are that the terms of the contract were not carried out. The default was by the Kanotex Company. The Imperial Company thus became liable to the Fern Company, and in turn the Kanotex Company became liable to the Imperial Company. The Imperial Company was sued by the Fern Company. Its liability under the contract was established; judgment was obtained against it, and it paid the judgment.

Notice of the suit was given by the Imperial Company to the Kanotex Company, and demand was made that the latter company come in and defend. Under these circumstances we think that the Kanotex Company is bound by the judgment obtained against the Imperial Company.

In Washington Gas Light Co. v. District of Columbia, 161 U. S. 316, 16 S. Ct. 564, 40 L. Ed. 712, the court quoted with approval from the opinion of the court in Littleton v. Richardson, 34 N. H. 179, 187, 66 Am. Dec. 759, as follows:

"When a person is responsible over to another, either by operation of law or by express contract, and he is duly notified of the pendency of the suit, and requested to take upon him the defense of it, he is no longer regarded as a stranger, because he has the right to appear and defend the action, and has the same means and advantages of controverting the claim as if he were the real and nominal party upon the record. In every such case, if due notice is given to such person, the judgment, if obtained without fraud or collusion, will be conclusive against him, whether he has appeared or not."

A similar rule is laid down in Oceanic Steam Nav. Co. v. Campania Transatlantica Espanola, 144 N. Y. 663, 39 N. E. 360. To the same effect see Marine Ins. Co. v. McLanahan (C. C. A.) 5 F.(2d) 773; Dayton Power & Light Co. v. Westinghouse E. & Mfg. Co. (C. C. A.) 287 F. 439; Royal Ins. Co. v. St. L.-S. F. Ry. Co., 291 F. 358 (C. C. A. 8); Washington & Berkeley Bridge Co. v. Penn. Steel Co. (C. C. A.) 215 F. 32; Burley v. Compagnie De Navigation Francaise (C. C. A.) 194 F. 335; B. Roth Tool Co. v. New Amsterdam Cas. Co., 161 F. 709 (C. C. A. 8). Of course, the estoppel does not extend beyond the questions necessarily determined by the judgment.

There remains for consideration the question of the statute of limitations. The applicable statute is section 60—306, Revised Statutes of Kansas, 1923. The statute, so far as pertinent, is set out in the margin.[1] It is conceded by plaintiff in error that the

---

[1] "60—306. *Civil Actions Other Than for Recovery of Real Property.* Civil actions, other than for the recovery of real property, can only be brought within the following periods, after the cause of action shall have accrued, and not afterwards:

"First. Within five years: An action upon any agreement, contract or promise in writing.

"Second. Within three years: An action upon contract, not in writing, express or implied: an action upon a liability created by statute, other than a forfeiture or penalty."

three-year and not the five-year provision applies.

The present suit was started at least as early as November 16, 1926. When did the cause of action arise? Defendant in error contends that it arose when the Kanotex Company failed to carry out the terms of the Fern Oil Company contract, which was at least prior to February 28, 1920. If this contention is correct, then the cause of action was plainly barred. Plaintiff in error contends that the cause of action arose when it was compelled to pay the judgment which the Fern Oil Company obtained, or at least not earlier than the date when the judgment was entered, which was April 20, 1925. If this contention prevails, the cause of action was not barred.

We think the latter contention is the correct one. The cause of action of the Imperial Company against the Kanotex Company, set out in the complaint, was not primarily for breach of contract, nor for injury to property rights, but was for reimbursement of moneys which the Imperial Company had been compelled to pay or had become liable to pay because of the default of the Kanotex Company. As between the Imperial Company and the Kanotex Company, as above stated, the primary liability to perform the contract rested on the Kanotex Company. The liability of the Imperial Company was secondary. The latter company having been forced to respond in damages for the breach of the contract, it could recover from the Kanotex Company on the broad equitable principles of indebitatus assumpsit, the amount so paid. The right to sue for this reimbursement did not arise until the payment had been made by the Imperial Company, or at least not until the liability of that company to pay the money had been determined by entry of judgment against it. Power v. Munger, 52 F. 705 (C. C. A. 8). See, also, 31 C. J. p. 452, § 51; 37 C. J. pp. 838, 839, §§ 191, 192; Security Nat. Bank v. Home Nat. Bank, 116 Kan. 530, 533, 227 P. 365.

Our conclusion is that the sustaining of the demurrer to the complaint and the entering of judgment dismissing the cause constituted error, and that the judgment should be reversed.

It is so ordered.